IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

AUGUSTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.          ) | CR 122-019 |
| ) | |
| LYONDO LARELL WARE   ) | |
| ) | |

---

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

---

Defendant, charged with illegal firearm possession, seeks to suppress a handgun and statements obtained during a search of his residence on September 21, 2021, as well as recordings of his jail calls. After careful consideration of all briefing and the evidence presented at the hearing on January 24, 2023, the Court **REPORTS** and **RECOMMENDS** Defendant's motion to suppress be **DENIED**. (Doc. nos. 43, 60.)

I.   BACKGROUND

　A.   **Search of Defendant's Home**

The search of Defendant's home was part of a larger effort to curb a spike in gang violence caused by a dispute between two rival gangs, Loyalty Over Everything, a/k/a "LOE" or "LOE 32" and the Bolt Drive Alley Boyz. See Court's recording system, *For the Record*, (hereinafter FTR), Jan. 24, 2023, 10:45:10-10:46:07, 10:54:00-10:55:19. The dispute began in December 2019, when one member of each gang was killed at the Private Eye Club, and the ensuing clashes involved sixty-one violent crimes through September 2021. FTR 10:56:00-10:57:29. When senior members of each gang met at the Oak Lounge to negotiate peace

between them, a massive fight broke out instead. FTR 10:58:03-10:58:43. In an attempt to end the violence, the Richmond County Sheriff's Office conducted an operation involving execution of ten search warrants for homes of known gang members who were parolees or probationers, and eleven arrest warrants for affray for gang members known to be involved in the Oak Lounge brawl. FTR 11:19:50-11:20:42.

Investigators targeted Defendant during this sweep because he was on probation and known to be a member of LOE. FTR 10:45:10-10:46:07, 11:00:54-11:01:09. The Georgia gang database listed Defendant as a member of LOE and stated his membership had been verified in 2014 and 2017. FTR 10:42:55-10:43:04, 11:28:05-11:28:36. Prior to executing a search on Defendant's residence, investigators confirmed Defendant was a current LOE member by speaking with a confidential informant and reviewing Defendant's social media. FTR 10:45:10-10:46:07, 10:49:50-10:50:08, 11:29:40-11:31:37, 11:34:10-11:34:50. Investigators understood Defendant was a senior member of LOE and part of the LOE "executive round table" based on an organizational chart of LOE's hierarchy found during the search of a member's jail cell. FTR 10:51:50-10:53:18, 11:01:15-11:01:20, 11:19:40-11:19:50.

Officers executed the search at Defendant's home in the early morning of September 21, 2021. (Doc. no. 48, Ex. 1.) Defendant was home with his girlfriend, Crystal Merriweather, and their child. (Id.); FTR 12:29:29-12:31:21. As a safety precaution, Investigator Green testified the search team instructed Defendant and Ms. Merriweather to sit on the living room couch during the search while an armed officer stood nearby. FTR 11:11:03-11:11:05, 12:52:00-12:52:10. When Investigator Green spoke with Defendant during the search, Defendant did not deny he was a member of LOE, blamed younger gang members for the

ongoing violence, and said he could not do anything to curb the violence. FTR 11:03:34-11:03:56, 11:24:00-11:24:36.

Officers found a Glock .45 caliber handgun in a crib next to the bed in the master bedroom. FTR 11:06:46-11:07:06, 12:31:15-12:32:34. Officers also found .45 caliber bullets and two loaded .45 caliber magazines in the closet. (Doc. no. 48, Ex. 1); FTR 12:31:15-12:32:34. Also in the closet, officers found 5.8 grams of cocaine, a pair of pants decorated with "Loyalty Over Everything" gang symbols, and $1,064.00 of cash in a jacket pocket. FTR 11:05:55-11:06:17, 11:06:46-11:07:06, 12:31:15-12:32:34.

After finding the cocaine and handgun, Investigator Christopher Brown found documents showing Ms. Merriweather was also a convicted felon. FTR 12:33:40-12:34:00. In Defendant's presence, Investigator Brown questioned Ms. Merriweather about her felony status, explained it was illegal for her to possess a handgun, and reasoned she had equal access to the handgun in the bedroom she shared with Defendant. FTR 12:39:40-12:39:56, 12:39:40-12:39:56. Defendant claimed ownership of the handgun to Investigator Brown, and further explained he carried it to protect himself from the ongoing gang violence. FTR 12:38:56-12:41:30. Defendant was not yet Mirandized when he made these statements. FTR 12:44:15-12:44:28. Investigator Brown testified that officers did not arrest Ms. Merriweather because there was no one else at the home to care for the child. FTR 12:58:00-12:59:12.

Several minutes later, Investigator Brown read Defendant his Miranda rights. (See doc. no. 59, Ex. 1, Video $RCSO_C031_506_20210921_105232_00, at 10:52:02-10:52:20.)[1] Defendant affirmed he understood his rights, and when Investigator Brown asked Defendant

---

[1] Because there are multiple videos in government's first exhibit, the videos are labeled as each is named in the exhibit files and timestamps are cited accordingly. (See doc. no. 59, Ex. 1.)

if he would like to speak with him, Defendant responded, "We can." (Id.) Investigator Brown asked Defendant where he purchased the cocaine, and Defendant demurred, explaining he did not want to set someone up. (Id., Video $RCSO_C031_506_20210921_105820_00, at 10:52:46-10:56:11.) Officers informed Defendant of the state and federal charges he could face. (Id. at 10:56:11-10:56:50.) Defendant claimed ownership of the handgun and restated he was not going to set anyone up. (Id. at 10:56:47-10:58:19.) Officers ceased questioning. (Id.)

B. **Defendant's Probation Status**

On January 15, 2015, Richmond County Superior Court Judge J. David Roper sentenced Defendant to four years of imprisonment followed by four years of probation for felony drug charges. (Doc. no. 59, Ex. 3, p. 7.) Documents accompanying the plea agreement, all signed by Defendant, contained two Fourth Amendment waivers. (See generally id. at Exs. 3, 4.) The first waiver required Defendant to submit to a search at any time, whenever requested by law enforcement, "upon reasonable cause to believe" Defendant violated his probation conditions or committed a crime. (Id. at Ex. 3, p. 11.) The second waiver confirmed Defendant's consent to a search "with or without probable cause, with or without a search warrant, and at any time of the day or night." (Id. at 15.)

C. **Recorded Jail Phone Calls**

Deputy Carl Garganeous testified that, upon arrival at the Richmond County Jail, inmates are told during intake their phone calls may be monitored or recorded. FTR 10:15:42-10:15:16. In addition, every time an inmate participates in a jail phone call, the phone system plays a warning at the beginning stating the call may be monitored or recorded. FTR 10:15:50-10:15:56. Inmates also receive electronic kiosk access to the inmate handbook, which states

4

all calls may be recorded except those involving legal counsel.  FTR 10:16:31-10:18-14, 10:30:40-10:30:52.  Phone calls with attorneys are not recorded if the attorney has registered their phone number with the calling system.  FTR 10:30:40-10:30:52.  Alcohol, Tobacco, and Firearms Special Agent Wes Whitaker obtained from the jail's recording system approximately 160 recordings of calls involving Defendant.  FTR 10:34:50-10:35:26.  The government plans to use five calls as evidence at trial.  (See doc. no. 59, Exs. 5-9.)

## II.  DISCUSSION

Defendant argues the search of his home violated the Fourth Amendment because the search waivers he signed as a state probationer expired and were invalid and officers did not have probable cause for the search.  He further argues all statements he made during the search, both before and after being Mirandized, should be suppressed.  (See generally doc. nos. 43, 60.)  Finally, Defendant argues all recordings of his jail phone calls should be suppressed as an improper infringement of his privacy.  As explained below, the Court finds no basis for suppression of any evidence or statements.

### A.  Defendant's Fourth Amendment Waivers Diminished His Expectation of Privacy, and Officers Properly Conducted the Search Based on Reasonable Suspicion

The Fourth Amendment provides "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. Amend. IV. The Fourth Amendment generally requires a search warrant with probable cause, and searches conducted without a search warrant are considered "per se unreasonable

5

under the Fourth Amendment [and are] subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967).

Although the Fourth Amendment's protection against unreasonable searches and seizures applies to probationers, they "may be subject to restrictions that diminish [their] reasonable expectations of privacy," such as conditions of probation allowing warrantless searches. United States v. Boynton, 337 F. App'x 801, 803 (11th Cir. 2009); Owens v. Kelley, 681 F.2d 1362, 1367 (11th Cir. 1982). "Such limitations are permitted because probationers have been convicted of crimes and have thereby given the state a compelling interest in limiting their liberty in order to effectuate their rehabilitation and to protect society." Owens, 681 F.2d at 1367.

Courts "'examine the totality of the circumstances' to determine whether a search is reasonable within the meaning of the Fourth Amendment." Samson v. California, 547 U.S. 843, 848 (2006) (quoting United States v. Knights, 534 U.S. 112, 118-19 (2001)). This is because "[t]he touchstone of the Fourth Amendment is reasonableness," determined by "assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." Knights, 534 U.S. at 118-19 (internal quotation marks and citations omitted).

Applying the balancing test articulated in Knights, the Court finds reasonable suspicion is the correct standard for analyzing the reasonableness of the search of Defendant's home. The undisputed facts show Defendant signed two Fourth Amendment waivers that severely diminished his expectation of privacy. The first waiver required Defendant to submit to a search at any time, whenever requested by law enforcement, "upon reasonable cause to believe" Defendant violated his probation conditions or committed a crime. (Doc. no. 59, Ex.

6

3, p. 11.)  The second waiver confirmed Defendant's consent to a search "with or without probable cause, with or without a search warrant, and at any time of the day or night." (Id. at 15.)  In addition to the broad scope of the waivers signed by Defendant, there is considerable government interest in supervising probationers because they are more likely to violate the law. Knights, 534 U.S. at 120.

The Court finds officers had reasonable suspicion to search Defendant's home.  Far more than a hunch or guess, the officers knew Defendant was a current, senior member of LOE, a street gang embroiled in a feud with the Bolt Drive Alley Boyz that had caused at least sixty-one violent crimes in merely nineteen months.  These facts establish, as the Supreme Court stated in Knights, "a sufficiently high probability that criminal conduct is occurring to make the intrusion on the individual's privacy interest reasonable." 534 U.S. at 121 (citation omitted); see United States v. Carter, 566 F.3d 970, 973-75 (11th Cir. 2009) (finding reasonable suspicion to search probationer when he "lived above his means" while on probation for drug charges and gave person business card with gang logo on it); United States v. Palmore, No. 7:21-CR-52-WLS-TQL, 2022 WL 17478240, at *5-*6 (M.D. Ga. Dec. 6, 2022) (finding reasonable suspicion due to defendant's validated status as gang member and recent shooting involving same gang); see also United States v. Wasser, 586 Fed. App'x 501, 505 (11th Cir. 2014) (finding reasonable suspicion because defendant was known gang member and anonymous accusation of continuing criminal acts).

Defendant argues the Fourth Amendment waivers expired prior to the search because he had already completed his term of probation.  The Court disagrees.  On January 15, 2015, Richmond County Superior Court Judge J. David Roper sentenced Defendant to four years of imprisonment followed by four years of probation.  (Doc. no. 59, p. 7.)  According to

7

Defendant, he gained early release from prison "no later than early 2017," such that his four years of probation should have ended in early 2021, months before the search occurred in September 2021. (Doc. no. 43, p. 4.) However, Defendant is incorrect because he was not placed on probation when released from prison in early 2017, rather, he was placed on parole to finish the remainder of his four-year prison sentence.

In the state of Georgia, an inmate who is released early must serve the remainder of the designated prison sentence on parole, and the period of probation only begins when the designated term of imprisonment ends. See O.C.G.A. § 42-9-42 (requiring parolees remain in custody of parole board "until the maximum term specified in his or her sentence, he or she is pardoned by the board, or his or her supervision is terminated . . . ."); O.C.G.A. § 17–10–1(a)(4) ("In cases of imprisonment followed by probation, the sentence shall specifically provide that the period of probation shall not begin until the defendant has completed service of the confinement portion of the sentence."); Hayward v. Danforth, 787 S.E.2d 709, 710-711 (Ga. 2016) (explaining prisoner released early completes remaining prison term on parole, then begins term of probation); Shafer v. Crockett, 287 S.E.2d 358, 359 (Ga. Ct. App. 1981) (same). Because Defendant's four-year probationary term could not begin until he completed the first four years of his sentence in prison and on parole, Defendant was on probation at the time of the search in 2021 and subject to the Fourth Amendment probation waivers.

Defendant also points out the two Fourth Amendment waivers he signed contain conflicting standards because one requires reasonable suspicion and the other permits searches with or without probable cause. Without citing any authority, Defendant argues this conflict renders both waivers invalid. Whether these waivers are legally enforceable misses the point. As the Denton court explained, "the issue is not whether Denton waived his Fourth

8

Amendment rights, but whether the Search and Seizure provision that was a condition of his probation and of which Denton was aware, diminished his expectation of privacy sufficiently to render a search based only on reasonable suspicion lawful under the Fourth Amendment . . . ." United States v. Denton, No. 1:11-CR-546, 2012 WL 3871929, at *7 (N.D. Ga. June 19, 2012), *adopted by*, 2012 WL 3871927 (N.D. Ga. Sept. 5, 2012); see also United States v. Yuknavich, 419 F.3d 1302, 1307-09 (11th Cir. 2005) (finding diminished expectation of privacy despite absence of search condition); Carter, 566 F.3d at 973-75 (same).  Thus, the presence of two Fourth Amendment waivers, rather than one, only served to reinforce to Defendant of a diminished expectation of privacy.

  **B. There Is No Basis for Suppression of Defendant's Statements**

Defendant seeks suppression of all statements made at his home during the search. These statements can be categorized as follows:  (1) pre-Miranda statements made prior to the officers finding the handgun and drugs; (2) pre-Miranda statements made after the officers found the handgun and drugs; and (3) post-Miranda statements.  After carefully considering Defendant's arguments, the Court finds no basis for suppressing any of the statements.

  1. **The Miranda Framework**

"No person . . . shall be compelled in any criminal case to be a witness against himself. . . ." U.S. CONST. amend. V.  "To give force to the Constitution's protection against compelled self-incrimination, the Court established in Miranda v. Arizona, 384 U.S. 436 (1966), 'certain procedural safeguards that require police to advise criminal suspects of their rights under the Fifth and Fourteenth Amendments before commencing custodial interrogation.'"  Florida v. Powell, 559 U.S. 50, 59 (2010) (citing Duckworth v. Eagan, 492 U.S. 195, 201 (1989)).  Under Miranda, prior to conducting a custodial interrogation, law enforcement officers must warn the

9

interview subject that he has a "right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." 384 U.S. at 444.

The Supreme Court has defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda, 384 U.S. at 444. When analyzing whether Miranda warnings are required, the Court must decide whether "under the totality of the circumstances, a reasonable man in the suspect's position would feel a restraint on his freedom of movement fairly characterized as that degree associated with a formal arrest to such extent that he would not feel free to leave." United States v. Paige, 541 F. App'x 620, 622 (11th Cir. 2007) (*per curiam*) (citing United States v. Muegge, 225 F.3d 1267, 1270 (11th Cir. 2000) (*per curiam*) (citation omitted).)

"The test is objective: the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant." United States v. Moya, 74 F.3d 1117, 1119 (11th Cir. 1996). The objective standard contemplates the perspective of a reasonable innocent person. Paige, 541 F. App'x at 622. Factors to consider include whether "the officers brandished weapons, touched the suspect, or used language or a tone that indicated compliance with the officer could be compelled." United States v. Street, 472 F.3d 1298, 1309 (11th Cir. 2006).

A seizure does not equate to custody for Miranda purposes. Id. at 1309-10. A person is "seized" when "a reasonable person would not feel free to terminate the encounter" with the police. Id. at 1310. A person is in custody "only when there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." Id. (citation omitted);

10

see also United States v. Luna-Encinas, 603 F.3d 876, 881 (11th Cir. 2010) ("We previously have explained, however, that although a reasonable person in the defendant's position may feel constrained not to leave the scene of a police encounter at a particular moment – and thus may be deemed to have been 'seized' by law enforcement – he will not necessarily be considered in 'custody' for Fifth Amendment purposes.").

In Jackson v. Denno, 378 U.S. 368, 376 (1964), the Supreme Court explained that a defendant is deprived of Due Process if he is convicted, based in any part, on an involuntary confession. Coercion may be mental or physical, Blackburn v. Alabama, 361 U.S. 199, 206 (1960), and " '[s]ufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession.'"  United States v. Thompson, 422 F.3d 1285, 1295-96 (11th Cir. 2005) (quoting United States v. Mendoza-Cecelia, 963 F.2d 1467, 1475 (11th Cir. 1992), *abrogated on other grounds*, Coleman v. Singletary, 30 F.3d 1420 (11th Cir. 1994)).

>    **2.   Pre-Miranda Statements, Made Prior to Discovery of the Handgun and Drugs, Should Not Be Suppressed Because Defendant Was Not in Custody**

Having carefully considered the totality of the circumstances prior to discovery of the handgun and drugs, the Court finds Defendant was not in custody because a reasonable person in his position would not have felt "a restraint on his freedom of movement fairly characterized as that degree associated with a formal arrest to such extent that he would not feel free to leave." Paige, 541 F. App'x at 622.  The tone and demeanor were calm, and there was no brandishing of weapons, touching of Defendant, intimidation, aggression, threats, coarse language, or raised voices. While the officers did not tell Defendant he was free to leave, they

11

also did nothing to suggest Defendant was under arrest or that he could not leave. Defendant never expressed any desire to leave the house or the living room, and officers allowed Ms. Merriweather to move around the house with her child.

Although questioning in a defendant's home is not dispositive, United States v. Brown, 441 F.3d 1330, 1348 (11th Cir. 2006), "courts are *much* less *likely* to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings, such as the suspect's home." United States v. Gomes, 279 F. App'x 861, 868 (11th Cir. 2008) (*per curiam*) (citation omitted); see also United States v. Newton, 369 F.3d 659, 675 (2d Cir. 2004) ("[A]bsent an arrest, interrogation in the familiar surroundings of one's own home is generally not deemed custodial."); United States v. Peck, CR 113-171, 2014 WL 1572437, at *14 (N.D. Ga. Apr. 18, 2014) (holding that questioning in a suspect's home weighs against determination of custodial interrogation requiring Miranda warnings).

While the officers never uttered the phrase "free to leave," this omission is not dispositive of the custody analysis, and courts often find no custody where, as here, a host of other facts show the restraint on freedom never approached the degree associated with a formal arrest. See, e.g., United States v. Teers, 591 F. App'x 824, 836 (11th Cir. 2014) (*per curiam)* (finding no custody despite omission because defendant not physically forced to interview, nor was he handcuffed or restrained); see also United States v. Phillips, 812 F.2d 1355, 1362 (11th Cir. 1987) (finding defendant not in custody during interview at police station despite omission because he was not restrained during interview, did not attempt to terminate interview, and did not ask for lawyer); United States v. Brown, 2021 WL 3916845, at *6 (Aug. 11, 2021) (finding no custody despite omission because conversation was cordial, non-confrontational, and conversational, and at no time did officers inspect, touch, frisk, search, or restrain).

12

Defendant complains officers restricted him to the living room during the search, in the presence of an officer who was armed. However, minor restraints on freedom of movement during a search do not convert a non-custodial setting to a custodial setting. See United States v. Matcovich, 522 F. App'x 850, 852 (11th Cir. 2013) (*per curiam*) (no custody where officers temporarily handcuffed residents and placed them in central location); United States v. Varnell, No. 1:13-CR-394, 2014 WL 5517923, at *3, *7-8 (N.D. Ga. Oct. 28, 2014) (finding no custody where agent escorted all members of residence, including defendant, to living room while executing search); United States v. Graham, No. 3:13-CR-11-TCB, 2014 WL 2922388, at *3, *6-7 (N.D. Ga. June 27, 2014) (finding no custody where fifteen agents temporarily placed defendant and fellow residents in handcuffs and transported them to central location in house).

Defendant also accuses officers of threatening his girlfriend and making her cry. However, such an accusation is belied by the body camera footage and the testimony of Investigators Green and Brown. The Court finds their testimony credible. Investigators have both worked for the sheriff's office for several years, were present for all the events in question, and provided testimony consistent with the body camera footage. See United States v. Williams, 731 F.3d 1222, 1230 (11th Cir. 2013) ("Credibility determinations are typically the province of the fact finder because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses.") (citation omitted).

For these reasons, and having considered the totality of the circumstances, the Court finds Defendant was not in custody during this initial phase of the search and thus Miranda warnings were not required. In addition, the Court finds the government has demonstrated by

a preponderance of the evidence these pre-Miranda statements were voluntary. Lego v. Twomey, 404 U.S. 477, 489 (1972) (applying preponderance of the evidence test in voluntariness inquiries); United States v. Grimes, 142 F.3d 1342, 1350 (11th Cir. 1998) (same).

### 3. Pre-Miranda Statements Made While Defendant Was in Custody Should Not Be Suppressed Because They Were Spontaneous

The government concedes Defendant was in custody from the moment officers discovered the handgun and drugs. Several minutes elapsed between this discovery and Defendant being Mirandized. During this short time, Investigator Brown found Ms. Merriweather's felony probation paperwork, questioned her about her felony status, and explained it was illegal for her to also possess a handgun and that she had equal access to the handgun in the shared bedroom. Defendant claimed ownership of the handgun and explained he carried it to protect himself from the ongoing gang violence. Defendant argues these pre-Miranda statements should be suppressed. The Court disagrees.

Not all statements made in custody are considered the product of interrogation and require Miranda warnings, but, instead, the interrogation "must reflect a measure of compulsion above and beyond that inherent in custody itself." Rhode Island v. Innis, 446 U.S. 291, 299-300 (1980) (citing Miranda, 384 U.S. at 478). Thus, Miranda warnings are only necessary when the person in custody is subjected to "express questioning or its functional equivalent" officers "should have known were reasonably likely to elicit an incriminating response." Id. at 301, n.5. In contrast, "[v]oluntary and spontaneous comments . . . are admissible evidence if the comments were not made in response to government questioning." United States v. LaFond, No. 1:13-CR-92-01-WSD-LTW, 2013 WL 6269448, at *2 (N.D. Ga. Dec. 4, 2013); Cannady v. Dugger, 931 F.2d 752, 754 (11th Cir. 1991) ("Voluntary and

spontaneous comments, even after Miranda rights are asserted, are admissible evidence if the comments were not made in response to government questioning.").

Here, Defendant made incriminating statements spontaneously and in the absence of any questioning or accusations by the officers directed to him. While officers informed Defendant's girlfriend of the charges she could be facing, such information does not amount to coercion. Innis, 446 U.S. at 300-01 (noting explanation of charges directly to defendant is excluded from definition of interrogation because it does not reflect measure of compulsion above and beyond that inherent in custody itself); United States v. Jones, No. 1:12-CR-380-WSD, 2013 WL 5963125, at *7 (N.D. Ga. Nov. 7, 2013) (holding officers truthfully informing suspect of charges he could face is not interrogation for Miranda purposes).

Furthermore, while Defendant argues he confessed to shield his girlfriend from exposure to a felon in possession charge, his voluntary decision to take the blame when officers were speaking with his girlfriend about the potential charges against her does not form a valid basis for suppression. United States v. Smallwood, 2014 WL 3519195, at *19 (N.D. Ga. July 16, 2014) ("[B]efore the administration of Miranda warnings. . .there [was no] evidence that "force or coercion [was]. . .directed at [Smallwood]"); see also Thompson v. Haley, 255 F.3d 1292, 1297 (11th Cir. 2001) (holding, in the post-Miranda context, there was no coercion when officer told accused his girlfriend would be charged for murder unless he confessed because officer had probable cause to arrest her too); Allen v. McCotter, 804 F.2d 1362, 1364 (5th Cir. 1986) (finding officer's threat to file charges against robbery defendant's wife did not render confession involuntary). Thus, the Court finds the government has demonstrated by a preponderance of the evidence these statements were spontaneous and voluntary.

### 4. Defendant's Post-Miranda Statements Should Not Be Suppressed

After officers found Ms. Merriweather's felony probation paperwork and spoke to her about it, Investigator Brown read Defendant his Miranda rights. Defendant affirmed he understood those rights. When Investigator Brown asked Defendant if he would like to speak with him, Defendant responded, "We can." Defendant proceeded to speak with the officers and never once indicated he wanted legal counsel or wished to stop the conversation.

To establish the admissibility of post-Miranda statements, the government must show by a preponderance of the evidence that an individual knowingly, intelligently, and voluntarily waived his Miranda rights. United States v. Chirinos, 112 F.3d 1089, 1102 (11th Cir. 1997); see also Colorado v. Connelly, 479 U.S. 157, 168-69 (1986). Voluntary means "the product of a free and deliberate choice rather than intimidation, coercion, or deception." Moran v. Burbine, 475 U.S. 412, 421 (1986). Knowing and intelligent means a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Id. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that Miranda rights have been waived. Id. at 421; Edwards v. Arizona, 451 U.S. 477, 482 (1981); Fare v. Michael C., 442 U.S. 707, 725 (1979).

To find a waiver involuntary, coercion by law enforcement is a "necessary predicate," Connelly, 479 U.S. at 167, and "in the absence of [such] coercion a court cannot conclude a defendant's waiver or inculpatory statements are involuntary," United States v. Minard, 208 F. App'x 657, 660 (10th Cir. 2006). Among the factors a court must consider are "the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police." Hubbard

16

v. Haley, 317 F.3d 1245, 1253 (11th Cir. 2003); see also Thompson, 422 F.3d at 1295-96 ("Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession.").

Here, after carefully considering the totality of the circumstances, the Court finds Defendant knowingly and voluntarily waived his Miranda rights. The officers administered the Miranda warnings to Defendant. The body camera footage confirms Defendant's obvious intelligence, the short length of his detention, the absence of any physical force, and the absence of any promises or inducements. Furthermore, the tone and demeanor of the encounter were calm, and there was no brandishing of weapons, intimidation, aggression, threats, coarse language, or raised voices. Thus, Defendant's post-Miranda statements were voluntary and "the product of an essentially free and unconstrained choice." Thompson, 422 F.3d at 1252.

C.    **Defendant Impliedly Consented to the Recording of His Jail Calls**

When a jail plays a recording at the beginning of a call warning the inmate and other parties of the potential for monitoring and recording, the inmate and other parties impliedly consent to monitoring and recording by continuing the call. United States v. Faulkner, 439 F.3d 1221, 1224-25 (6th Cir. 2006) (concluding adequate notice for implied consent given when inmates were told jail calls were being monitored); United States v. Hodge, 85 F. App'x 278, 281 (3d Cir. 2003) (finding inmate consented to recording because every jail call began with warning message); see also United States v. Mitchell, 2013 WL 3808152, at *36 (M.D. Fla. July 22, 2013) ("[Defendants] implicitly consented to the recording of the calls by continuing the conversations despite the warning."); United States v. Corona-Chavez, 328 F.3d 974, 978 (8th Cir. 2003) (finding implied consent because inmate proceeded with phone call

17

after warning message); United States v. Hammond, 286 F.3d 189, 192 (4th Cir. 2002) (same); United States v. Footman, 215 F.3d 145, 155 (1st Cir. 2002) (same); United States v. Van Poyck, 77 F.3d 285, 292 (9th Cir. 1996) (same).

Here, the undisputed evidence shows Defendant received the warning message and thus impliedly consented to the recordings by continuing to make copious amounts of phone calls while in jail. Deputy Garganeous testified that every inmate is warned their calls may be monitored and recorded upon their admission to the Richmond County Jail and thereafter by the playing of an automated warning message at the beginning of every jail call. While Defendant expresses concern about the possibility his calls with legal counsel were recorded, the Richmond County Jail has established a reliable system for avoiding the recording of calls with legal counsel. Attorneys need only register their phone numbers with the system to avoid being recorded. Just as importantly, the government has limited its trial evidence to only non-legal jail calls identified as Exhibits 5 to 9. (Doc. no. 59, p. 10; Exs. 5-9.) There is no valid basis for the suppression of these select recordings.

## III.   CONCLUSION

For the reasons set forth above, the Court **REPORTS** and **RECOMMENDS** Defendant's motion to suppress be **DENIED**. (Doc. nos. 43, 60.)

SO REPORTED and RECOMMENDED this 3rd day of March, 2023, at Augusta, Georgia.

_____
BRIAN K. EPPS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA